in this matter, it seems to me that the dispositive issue is whether the property itself was intended to be used for domestic purposes or at least for a homeowner's purposes. As the Court knows, this was rural property with a large open space and a marijuana garden in the back. I submit to the Court that there was a natural enclosure of the entire property. It wasn't a situation where there was a residence, fenced-off property, and then a natural barrier, as I think it was the Kent case, or maybe it was the Johnson case. Now, we've got some pictures in the record. Yes, we do. Could you help me interpret a picture that is Exhibit N? It's at page 215 on Supplemental Excerpts. Oh, you're ready to go here. Yeah, that one and the other. See, you're a straight man. I mean, did you work that out? That's good. Could you point out where the marijuana plants are in that picture? See? That's what I want to know. The CHP could not do that particularly well. So the marijuana garden, if I understand. So this is where the darker green is? Where the darker green is, yes. And could you point up the other picture, because I suspect that that's the other picture from that same exhibit. Yeah, there we go. It's a bit of a close-up. Yeah. And, again, the marijuana plants are? The marijuana plants. Yeah, so we're now looking the other direction, and it's the darker green. Okay. Yeah, that's what I thought, but I couldn't be sure as I looked at the picture unaided. Okay. Thank you. One of our cases. Have you authenticated these documents, by the way? These don't have superscripts and things. It's not a word processing. Never mind. It's Friday, you know. Okay. Now that's sort of. One of our cases, one of the Ninth Circuit cases, deals with a natural barrier, and the question is whether a natural barrier might constitute an enclosure for the purposes of curtilage. I would submit to the Court that we've been dealing with ramparts, we've been dealing with keeps within the ramparts, which are earthworks, natural barriers that have been used since time began to protect areas of concern, to protect homes, castles, and people. Well, what's the usage? I mean, part of it is the usage aspect. What's the home usage? The home usage in this case, this is a very rural area. If we assume, and as we must, that the residence, which is in the lower part of this exhibit, if the residence was built before the marijuana, the purpose of building the residence must be assumed for solitude, which is the use of, intended by the homeowner. He builds this house to come out to be in the wilderness or to be in his, to be in an environment other than an urban environment. That would be the intended use of the property. And use has got to change, it seems to me, depending upon where it is and what it is. So it's not really fair, I don't think, to say that this residence doesn't have a picnic table, this residence doesn't have a sheep pen or chickens or a barbecue set. It doesn't even have a telephone or light, does it? Well, I don't think the fact that I don't, in this particular case, I'm not sure that that really makes a difference because. Well, it's the first cousin to a tool shed, isn't it? First cousin, first cousin. The government concedes in its brief, concedes in its brief this is a residence. The officers. I understand. Somebody could physically reside there. And somebody did physically reside there. This is different than in the Barajos, Barajos case, which a fairly recent decision out of this Court. In that case, the dispositive factor was that it was a tool shed or something that was not a residence. But in that case also, the majority seemed. No castle. This is no castle. All right. This is no castle. But in that particular case, the majority seemed to say that the open fields are not what we are deciding the case on. We're deciding the case on the fact the so-called residence was, in fact, not a residence, traditional, nontraditional. Didn't really make any difference. But the large open expanse of land would have been within the curtilage. That's where the observations had been made. Would have been within the curtilage had this been a residence, as we understand it, and there would have been a residence to mean in the context of curtilage. Could you clarify for me just what the boundaries of ownership are here? In other words, we see this disputed road. That is, what is the relevance of the road? But I'm just curious. It is an open area. What's the parameter of ownership here and who has access to that road? Below the complete area of ownership I don't think was ever disclosed. It is my understanding that, looking at the other photograph, I think it's a little bit better view. But the area of ownership includes all of this, all of this around here. Access to this road, access to these roads, these are nothing more than skid roads. No, I know they are. And there's another exhibit that has the main entrance with the big gate across it, I understand. And that would be the only way to get onto this horseshoe road here? That's correct. There was some argument or discussion in the — there was some discussion in the district court about whether it would be possible to travel over these areas. But I suggest that that's almost a meaningless argument because any enclosure, any fortification can be breached. Now, I'm not sure this is in the record. I've read a fair amount of the testimony, but I'm not sure I've read all of it that would bear on this point. And it may or may not be in the record. If you're standing on the road where the house is, right up there by that little blue dwelling, but you're standing on the road, you're not up on that second floor. Right. Does your line of sight allow you to see the marijuana plant? No. Okay. And is that in the record? It is not in the record. But I — looking at the topography, this is — That's kind of my sense as I look at the picture, but picture's going to be deceiving. Okay. This is totally flat. This is a swale here. A little arroyo, yeah. Perhaps it would have been better for them to have introduced a topographical map, but that issue — Okay. But that's not in the record in any event. Okay. This is totally flat. This, my rampart, if you will, is the barrier, the external barrier. Okay. I would like to reserve a couple of minutes to respond. However, I do wish, with some fear and trepidation and mea culpas, to suggest a possible Blakeley issue, which occurred to me yesterday driving up here, and would possibly ask — I'm going to ask that possibly I be granted an opportunity to brief the issue sometime after. Could you give us a hint as to the Blakeley? Yes, I can. In this matter, the guideline range, if you will, fell well below what would have been — the defendant was sentenced to the mandatory minimum five years. His guideline range fell below what would have been 60 months. It was somewhere, I think, in the neighborhood of about 36 months. But the district court judge indicated that statutory minimum would trump it. The judge made a finding of fact that he neither pled nor proved to the jury that he was an organizer within the meaning of 3B1.1a. By finding that he was an organizer, it precluded consideration of the safety valve. It took from the district court judge the — his discretion to sentence him, the defendant, to less than the mandatory minimum. I see. And since this issue was not raised in your original briefing, you have not abandoned it for habeas purposes, have you? No. And further, let me ask you this. At the time when you filed your briefs in the United States and so on, at the time all the filing here, were these papers all filed pre-Blakeley? Yes. Everything was filed. I think my AOB was filed in February. My reply brief was filed April 28, 2004. And I was aware of this Court's — I became aware of this Court's recent decision in requesting letter advisement of Blakeley and — Okay. Well, at least we understand the outlines of the Blakeley claim that you'd like to make. Thank you very much. Thank you. And we'll give you some time for rebuttal. May it please the Court. Good morning. My name is Ken Malikian. I'm an assistant U.S. attorney in Sacramento. And, of course, I'm representing the appellant — excuse me, the appellee in this action, the United States of America. Your Honors, at the conclusion of the evidentiary hearing in this case, the district court stated, and this is on page 85 of the transcript, just looking at the photos, there's no way that the garden is part of the curtilage. Just prior to that, the district court had observed, instead of the marijuana garden being part of the house, the house seems to be an appendage that's used while people are working on this garden. If you strip the search affidavit down to its barest minimum, could you have alleged in front of the magistrate that an aerial surveillance was made of the property by two officers and that they believe that there is marijuana growing within the property? Your Honor, yes. I believe that was and is the case. The search warrant affidavit when the extraneous matters are stricken. And all of that information then would be available by reason of the air flight, not the ground search. That's correct. The information that was in the search warrant, Your Honor, is that on September 26th, the CHP helicopter observed what they believed to be a marijuana garden. How do we know it's marijuana instead of tomatoes by looking at the affidavit? By looking at the affidavit, what you have is the observation by three law enforcement officials, a CHP officer and then two officers, detectives Merrill and Lemus. Is there anything in the affidavit about their training and knowledge of aerial surveillance? No. In fact, because the affiant had included all of the information as to what had occurred on the ground, he was rather brief. In fact, he didn't mention at all their training and experience. If he had, clearly it would have been a much better situation for the magistrate. How do we then know that what they saw from the air, they just suspected it was marijuana, but it may have been tomatoes? Well, I think in a search warrant, all we need is probable cause. We don't have to prove it was marijuana. There's a probability that there's an illicit drug being raised as opposed to Heinz ketchup. Your Honor, what I would submit to the court is that looking at the information that was provided to the magistrate, the CHP officer said, I believe there's a marijuana garden there. He said that in the affidavit? Yes. Okay. Now, well, he didn't say that. It was double hearsay by the time I got to the affidavit, but the information was that a CHP officer had spotted what was believed to be a marijuana garden. In response to that, the sheriff's office sent up two individuals. Now, their experience isn't detailed at all, but I think the magistrate, if faced with that situation, could reasonably assume that the sheriff would send up two persons with some experience if they're looking for a marijuana garden. Yeah. They enter a property through a gate that has a posted sign, no trespassing. They meet a person at the gate who said, you're not welcome here, stay out, and they just breach the road and decide to drive on up, right? Well, I don't believe the record fully indicates what the person at the gate told them, but they did meet a person at the gate who was in the process of closing it. But, Your Honor, the witness testified that when they made the observation of the marijuana here, the ---- I'm worried about how they got there. They're entering the property on which there's a residential property, admittedly. They're entering from a gate up in this general area. The gate, I believe the evidence introduced at the hearing, was approximately 2,300 feet from the residence. They see the residence overhead, and Detective Lehman testified at the hearing that he just didn't think that there was a curtailage issue. You've got this road here that has to be crossed, this road here that has to be crossed, and though the estimates varied. Yeah, but once he gained access to the property, he went to both sites. He went to the growth site and he went to the residence site, and he actually physically made a preliminary search of the residence property, looking for firearms and other contraband, and then went and got his warrant and then came back and did the thorough search where he found the document that led to the other property. Yes. So most of the information he gleaned that led to the conviction was done outside of evidence gleaned pursuant to a search warrant, right? That's correct, and Judge Shub, as he noted when he decided this issue prior to trial, indicated that based upon the four done factors, he just didn't see any way as to how that marijuana garden was curtailage of the house. And in analyzing those four factors. The whole property fence where the gate is? No, there's just a gate. There's nothing else. You can walk right around the gate. Oh, the gate is just to bar motor vehicles and that kind of access? The rest of the boundary is all clear and unfenced? Right. The gate is six feet. There's evidence of that in the record. I'm not sure I was aware of it. I can quickly point to Judge Shub's findings on page 83, and that's supplemental excerpt of record, page 83. The next factor is whether the area is within an enclosure surrounding the home, and it's not here. The only argument that can be made with there's a fence below, which is about a half a mile away. Basically, the evidence was clear that there was a 16-foot wide gate at the entrance. I believe it's exhibit D, which is part of the supplemental excerpt of record, shows that you could walk right around that gate if you wanted to. A car couldn't drive through it, of course, but a pedestrian could walk right around it. And there was nothing else whatsoever on this entire land enclosing this property. There's no fence. There's no mesh. There's nothing indicating that the residence is tied to this marijuana garden in any way. And that was one of the factors that Judge Shub utilized in determining that the marijuana garden was not part of the curtilage. The distance he estimated, though there were differences of opinion in the evidence that was presented to him, the defense investigator estimated the marijuana garden was 350 feet from the structure. One of the detectives who actually walked it estimated it was 600 feet. The district court determined it was somewhere between that, but he said it was at least the 375 feet in Riley. So basically, Judge Shub determined that based upon the distance, based upon the lack of any enclosure other than that gate preventing cars from driving into the driveway, and the fact that there's no evidence whatsoever in this record that that garden and that area around the garden is used for anything other than to grow marijuana. Now, the first part of the property searched then was the garden and then the residence subsequently, right? Yes. The residence, Your Honor, while the garden was being searched, was secured. There was the second individual who was unaccounted for. The deputies entered the house quickly, then left it and secured it and went and obtained a search warrant, which took about four hours to obtain and execute. Basically, in summary, I would submit that when looking at the four factors enunciated in United States v. Dunn, the first factor weighs heavily in favor of this garden not being on the curtilage. This is a garden that's well in excess of 350 feet away from this residence. And as noted by the district court, this residence is actually a quasi-residence. It is absent any bathroom facility. There is no outhouse. As the district court observed, it appears to be a place or a building which is utilized solely for the purpose of housing someone who is growing or tending to the marijuana gardens. Secondly, we have the lack of any enclosure. We have absolutely no evidence whatsoever by enclosure or anything else that this area is attached to the residence in any way. In fact, as noted by the district court, two roads have to be crossed to get there. The third issue, which is quite clear, is that the area of the marijuana garden was not being utilized for anything that traditionally would be tied to a home. It was not being utilized in any kind of intimate activity. Well, there was an irrigation line. I think that's, isn't there? There's an irrigation line running from that blue structure down to the marijuana garden. That was part of the probable cause affidavit. Yes, that's correct. So why doesn't that link the two together? I'm sorry, Your Honor. I didn't hear the last part of your question. Why doesn't that link provide some linkage between the property and the garden? I think the Court's correct. It does provide some linkage, not the kind of linkage that a fence would or something a little more positive. But the Court's correct. It provides linkage indicating, and I think this actually works to the favor of the lack of curtilage, utilizing the third factor, the use. The only use for this area was to grow marijuana. It was not used. Would it have made a difference if the marijuana was interspersed with some other kind of vegetation? Well, I think it could have, certainly. I don't know if that would have been dispositive or not, but say that there were homegrown tomatoes and cucumbers and that they looked like they were being well kept and they looked like it was something that would be tended to, at least on an occasional, if not consistent basis, certainly. I would think that that would be the case. But there's no evidence anywhere on the record whatsoever that that portion of land, in excess of 375 feet away from the building, was used for anything other than to grow marijuana. In terms of coming back, you said the most important factor, dispositive factor anyway, was proximity. But, I mean, the case law suggests in a rural area, proximity takes on a much different meaning, and this picture demonstrates why in a rural area. It's not clear where the best cultivation area would be for a garden, but if that's an arroyo or where the water would be best allocated to actually generate growth in a real garden in that area, it's not clear that you wouldn't have to go there. And your suggestion that you have to fence it in to make it part of the curtilage, it seems a bit awkward, doesn't it? Your Honor, I'll give perhaps a ---- If they just put a fence, if they had just fenced around that little arroyo area, that that would be sufficient to show curtilage then? Your Honor, you've posed a number of questions. I'll try to quickly answer each of them. First, if I may, if I stated that the most important factor was the proximity or lack thereof, I misspoke. Basically, all four of these factors are important. I don't think that any of them are more important than the other, but it is an important factor. I would submit to the Court that certainly the fact this is a rural area has to come into play. The Second Circuit in the Riley case found a cottage that was 375 feet away from the residence to be in the curtilage, and they based part of their finding upon the fact that this was a rural area and not an urban or suburban area. So I can see that. That makes good sense. But the case law is clear that even in an urban area, the curtilage doesn't go on forever, that there has to be a stoppage somewhere where you don't expect the same privacy that you would in your house. Now, again, a fence itself would not be dispositive, but certainly if there had been some kind of fencing, any fencing, or for that matter, anything other than a hose to water the marijuana garden that showed some connection between the house and the garden or at least the area of the garden, I would submit that that would be a factor which would be deemed critical to the possibility of a curtilage. But there was none, so basically to answer the Court, if they had done it, yes, it would have made their case much stronger, but they didn't do it. And I would submit to the Court that the only factor that appears to be at all in favor of declaring this area to be the curtilage of this house is the gate that is way up there, which is the only entrance, or I should say the only blockage to entering the property. I know you're over time. Yes. I just want to get a fact question clarified. You say it was a hose. It says it was a large water line. Line. It was visible from the air. I called it a hose. That was incorrect. It was a line. It was 50-foot pieces of line, so I stand corrected. I apologize for holding you longer. Is there a well then up near the house? Is that the source of the water? Yes. So the well was probably serving the house and the marijuana garden, if that's what you're looking for? Absolutely. Second, do you agree with Mr. Bigelow that there's a potential Blakeley issue here with respect to the safety valve? There is a potential Blakeley issue. Do you have any objection to post-argument briefing on that? Do you do – has that argument been waived at this point? I don't think so, Your Honor. I'm happy to address it if the court wishes me to. That's not a problem. We've had no briefing, and so we might do it by supplemental briefing or whatever. And how long has this defendant been incarcerated? And if the – this may be too hard for you to do on your feet. I'm trying to figure out. If he is entitled to the safety valve, which is, of course, an issue, but if he is entitled to the safety valve if the finding of fact were to go the other way, how close to the end of his term of incarceration is he? Your Honor, he was incarcerated, I believe, was early October of 2002. So it's almost been two years. I haven't done this in my head, but I would submit to the Court that at this point in time, I don't think that's an issue, but it might very well become one while this case is still pending before the Court. Well, without holding you to a commitment on behalf of the government, can either counsel give us just a range, a guess? In other words, do you want us to rush this thing to judgment, or does it make a difference? That's the question. That's the question. Probably 21 to 27 months there may be, or it would be his – would be what the court would say. So you have three or four months you have to go, right? Sentence him to, yes. Okay. It depends on whether his admission of 300 plants or the court's finding of – or the jury's finding of 100 plants, whether it's level 16 or 18. That's a rough cut. This is all out prejudice to a revised PSR. Yes. Okay. Thank you. Thank you very much. Thank you. Would you like a minute for rebuttal? Just a minute, yes. Although there was only a single gate, the court in the government's excerpts in Defendant's Exhibit B, that gate is surrounded by a rather imposing natural barrier. That's the point I was trying to make earlier that, yes, anybody can scramble over it and anybody can scramble through the brush, but the fact of the matter is what surrounds this gate is a very imposing natural barrier that – That's Exhibit B, ER-9. Yes, in the government's excerpts of record. And there was also some reference to that in the transcript itself. There was testimony about that. And as I look at the pictures and I read the testimony, it's pretty clear that that's a fairly effective barrier against a vehicle driving along, although not a particularly effective barrier if somebody's willing to do a fair amount of walking. And, again – Well, actually, Exhibit D would indicate you can just sidestep around the right side of it if you're on foot. Do you disagree with that? Well, anybody can get over any barrier. I understand that, but it's not – you don't have to go in running it. You can just step around it. That's correct, yes. So it's a vehicle barrier, not a person barrier? From a physical standpoint, yes, the no trespassing signs would indicate it. A biological barrier you're not considering. It's a personal barrier. Okay. Thank you. Okay, thank you very much. If we want additional briefing on the Blakely issue, we'll give you an order to that effect. So until you hear from us on that issue, stand back. Thank you very much. Thank you. The case of United States v. Chartier is now submitted for decision. The next case on the calendar, United States v. Walker, has been submitted on the briefs. The case after that, Anaya v. Hickman, has been submitted on the briefs. The next argued case is United States v. Lau et al.
judges: Beezer, W. Fletcher, Fisher